**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT WICHITA**

| | |
|---|---|
| **JOHN CLIFFORD GLAHN, on behalf of** ) | |
| **himself and others similarly situated,** ) | |
| ) | |
| ) | **Case No.** |
| **Plaintiff,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| **v.** ) | |
| ) | |
| **WEST HILLS CAPITAL, LLC** ) | |
| **Serve:** ) | |
| **Joseph Unger** ) | |
| **100 N. Broadway Ave.** ) | |
| **Wichita, KS 67202** ) | |
| ) | |
| **and** ) | |
| ) | |
| **JOSEPH UNGER,** ) | |
| **Serve:** ) | |
| **100 N. Broadway Ave.** ) | |
| **Wichita, KS 67202** ) | |
| ) | |
| **Defendants.** ) | |

**CLASS ACTION COMPLAINT**

For his class action complaint against Defendants West Hills Capital, LLC ("WHC") and Joseph Unger ("Unger") (collectively, "Defendants"), Plaintiff John Clifford Glahn ("Glahn" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiff's attorneys, which included, among other things, a review of Commodity Futures Trading Commission ("CFTC") filings against First State Depository Company ("FSDC"), Argent Asset Group LLC ("Argent") and Robert Leroy Higgins ("Higgins"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

**INTRODUCTION**

1.      This is a securities class action on behalf of all persons and entities who entered into a Silver Deposit Account Lease Agreement or substantively similar agreement with WHC during the time-period April 20, 2018, through the present, selected FSDC as the depository for assets subject to the Silver Lease Program and lost all or part of those assets.

2.      Plaintiff seeks to pursue remedies against WHC and its sole member and Chief Executive Officer Unger under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule l0b-5 promulgated thereunder. Plaintiff also asserts a common law claim against Defendants in the event the Silver Deposit Account Lease Agreement referenced herein is deemed not to be a security under the Exchange Act.

**THE PARTIES**

3.      Plaintiff Glahn is a natural person residing in Joplin, Missouri.

4.      Defendant WHC is a limited liability company organized and existing under the laws of the State of Wyoming with a principal place of business at 100 N. Broadway, Wichita Kansas 67202.  Defendant WHC may be served through its registered agent, Joseph Unger, at this same address.

5.      Defendant Unger is the sole member and Chief Executive Officer of WHC. Defendant Unger may be served at WHC's offices at 100 N. Broadway, Wichita Kansas 67202.

**JURISICTION AND VENUE**

6.      Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

7.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367.

2

8.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District.

9.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail and interstate telephone communications.

## SUBSTANTIVE ALLEGATIONS

### *WHC and Unger*

10.     Defendant WHC specializes in the sale and promotion of precious metals as an investment vehicle, including for individuals wishing to invest in precious metals individual retirement accounts ("IRAs").

11.     WHC's marketing materials target older individuals like Plaintiff, who are interested in growing their wealth but also desire a safe investment where they are unlikely to lose money.

12.     WHC explains to visitors to its website, for example, that "[w]ith increasing political unrest and economic instability throughout the world, precious metals ***provide a safe harbor for your investments*** and should be a major part of every investor's portfolio." (emphasis added)

13.      WHC explains to visitors to its website that "owning precious metals isn't just an investment – it's the process of converting your hard-earned cash into gold, silver or other metals to ***preserve your purchasing power and wealth well into your future***." (emphasis added)

14.     WHC asks potential customers: "Will your portfolio survive a major market crash or recession?"  WHC then advises them to "[m]ake sure the money you've worked hard to earn *will be around when you need it*." (emphasis added)

15.     WHC tells potential customers to "PROTECT YOUR WEALTH THE RIGHT WAY!" and urges them to "[g]et the superior long-term investment choice for *retaining and growing wealth*." (emphasis added)

16.     WHC is owned by Unger, who also serves as the company's Chief Executive Officer.

17.     Unger plays a prominent role in marketing the business and is featured in a video that appears on the WHC's website.

18.     The Unger video begins by telling potential customers, "[w]e're old fashioned" and that "[w]hen you do a deal with West Hills Capital, we do it on a handshake."  It ends with these words: "*Preservation.  Growth.  And Income.*" (emphasis added)

*Plaintiff's Investment*

19.     In May 2019, Glahn decided to purchase precious metals from WHC through an IRA.  In particular, at WHC's and Unger's urging, Glahn decided to purchase American Silver Eagles ("ASE's"), the official silver bullion coin issued by the United States Mint.  Each coin weighs one ounce and is a minimum of 99.9% pure silver.  The weight and purity of ASEs is guaranteed by the United States government.

20.     To facilitate this purchase, at WHC's and Unger's direction, Glahn opened an IRA at New Direction Trust Company ("New Direction") on or about May 8, 2019.  A true and correct copy of the IRA application is attached hereto as Exhibit A.

21.     In opening this IRA, at WHC's and Unger's direction, Glahn executed a Transfer/Rollover Form causing part of the balance of his existing IRA at TD Ameritrade,

4

$176,700, to be transferred to his new IRA at New Direction.  A true and correct copy of this form is attached hereto as Exhibit B.

22.     In opening this IRA, at WHC's and Unger's direction, Glahn executed an Interested Party Designation Form identifying the interested party as "West Hills Capital/Joe Unger/WHC IRA Team."  This gave WHC, Unger and the WHC IRA Team unlimited access to Glahn's IRA account at New Direction.  A true and correct copy of this form is attached hereto as Exhibit C.

23.     In opening his IRA, at WHC's and Unger's direction, Glahn executed a Precious Metals Buy Direction Letter identifying the precious metals dealer as "West Hills Capital."  This authorized New Direction to allocate $176,700 in the New Direction IRA account for the purchase of metals from WHC.   A true and correct copy of this letter is attached hereto as Exhibit D.

24.     In opening his IRA, at WHC's and Unger's direction, Glahn executed a Depository Election Form designating FSDC as the place where the precious metals purchased from WHC would be stored. A true and correct copy of this form is attached hereto as Exhibit E.

25.     Following the execution of these documents, $176,700 was transferred from Glahn's IRA at TD Ameritrade to his IRA at New Direction and purportedly utilized to purchase 10,000 ASEs from WHC.  These ASEs purportedly were stored at FSDC.

### *The Silver Lease Program*

26.     At the time he purchased ASE's from WHC, Glahn was solicited to participate in the Silver Lease Program.

27.     The Silver Lease Program promised WHC customers the opportunity to earn compensation in the form of paid or reimbursed storage fees, shipping fees, IRA fees or other consideration in exchange for leasing their ASEs to WHC.

28.     WHC and Unger represented that ASEs leased from customers under the Silver Lease Program would be fully insured, so there was no risk to the customer.

29.     WHC and Unger represented that when ASEs were leased from customers under the Silver Lease Program, they would be promptly returned or equivalent value would be promptly returned to the customer's account, so there was no risk to the customer.

30.     Glahn agreed to participate in the Silver Lease Program and, at WHC's and Unger's direction, entered into a Silver Deposit Account Lease Agreement with WHC.  A true and correct copy of this agreement is attached hereto as Exhibit F.

31.     The Silver Deposit Account Lease Agreement is a security under the Exchange Act, specifically an investment contract.

32.     As promoted by WHC and Unger, the Silver Deposit Account Lease Agreement embodies an investment by the customer in a common enterprise with a reasonable expectation of profits derived from the efforts of WHC.

### WHC as Middleman

33.     Unbeknownst to Glahn and other WHC customers, the Silver Lease Program was merely a scheme to funnel ASEs to a company known as Argent.

34.     At all times herein relevant, Argent was in the business of buying, selling, and leasing coins, bullion, bars, and other precious metals, and touts itself as a "leading numismatic and precious metals trading firm."

35.     Unbeknownst to Glahn and other WHC customers, WHC and Argent were parties to an agreement known as the Maximus Agreement.

36.     Under the Maximus Agreement, WHC leased ASEs to Argent and in exchange, received twenty cents ($0.20) per month for each ASE leased.

37.     WHC thus made money by acting as a middleman.  Glahn and other WHC customers leased ASEs to WHC and received compensation in the form of paid or reimbursed storage fees, shipping fees, IRA fees or other consideration, and then WHC leased these same ASEs to Argent and received twenty cents ($0.20) per month for each ASE leased.  The difference between what WHC paid its customers and what it received from Argent was its profit.

38.     WHC and Unger did not disclose to Glahn and other WHC customers that WHC was acting as a middleman between them and Argent.  More than that, WHC actively concealed the very existence of Argent and WHC's relationship with that entity.  WHC caused customers to believe it maintained effective control and/or oversight of ASEs that customers leased to WHC as part of the Silver Lease Program.  In reality, WHC had little or no control or oversight over ASEs that customers leased to WHC as part of the Silver Lease Program because WHC immediately leased those ASEs to Argent.  Unbeknownst to WHC's customers, WHC was relying on Argent to safeguard WHC's customers' assets.

39.     On information and belief, in instances where a WHC customer transferred money to WHC for the purpose of purchasing ASEs that would be leased to WHC, WHC simply forwarded the money to Argent so that Argent could purchase the ASEs.  These ASEs were treated as having been leased from the customer to WHC and leased from WHC to Argent.  WHC created documentation to cause the customer to falsely believe that WHC, rather than Argent, had` purchased the ASEs on the customer's behalf.  This is contrary to the Precious Metals Buy Direction Letter that Glahn and other WHC customers executed, which identified WHC as the precious metals dealer and not Argent.

40.     One fact speaks volumes about WHC's true intentions and motivations.  On information and belief, the *only* entity to whom WHC ever leased ASEs under the Silver Lease Program was Argent.  The only one.  Yet, despite this fact, at no point did WHC or Unger reveal

to customers that Argent existed or was part—indeed, an integral part—of the Silver Lease Program.  WHC and Unger kept this information secret so as to avoid prompting customers to investigate Argent or to dig too deeply into the relationship between Argent and WHC.

### *The Selection of FSDC as Depository*

41.     It was not mere happenstance that led Glahn and other WHC customers to select FSDC as the depository for the ASEs they purchased from WHC.  WHC customers selected FSDC as the depository for ASEs they purchased from WHC because WHC and Unger directed them to select FSDC as the depository for these assets.

42.     WHC attempted to ensure customers would follow its directions by warning them on its website, in a blog about silver scams, "You'll be better off dealing with a company that has ***an established partnership with a leading custodian and top-rated depository***." (emphasis added) On information and belief, this was intended to create the impression that WHC had an established partnership with a "leading custodian and top-rated depository."

43.     WHC had a relationship with FSDC but knew or should have known that FSDC was anything but "top-rated."  In fact, FSDC previously was sued and found liable for mishandling collateral related to a $10 million loan by transferring that collateral to another entity owned by Robert Leroy Higgins which then disposed of the collateral as if it were its own.  *See Israel Discount Bank of New York v. First State Depository Co., LLC*, Civil Action No. 7237-VCP, 2013 WL 2326875 (Del. Chanc. Ct. May 29, 2013).  To the extent WHC was aware of this prior lawsuit—and WHC was or should have been aware of this prior lawsuit—it did not disclose these facts to Glahn and other WHC customers.

44.     Unbeknownst to Glahn and other WHC customers, the reason WHC and Unger directed WHC customers to select FSDC as the depository for these assets is because FSDC was owned and controlled by the same person that owned and controlled Argent, Higgins.

45.     This common ownership helped facilitate the transfer of customer assets between WHC and Argent under the parties' Maximus Agreement because the assets purportedly were stored in FSDC's vault and Argent had offices at FSDC.  Indeed, oftentimes, customer assets never reached the FSDC vault, and instead were just delivered directly to Argent's offices.  The layer of protection that customers were led to believe they enjoyed through the use of an independent, "top-rated depository" simply did not exist.

46.     WHC and Unger failed to disclose to Glahn and other WHC customers its real reason for directing them to select FSDC as the depository for their assets. Instead, WHC and Unger caused them to believe FSDC was chosen because it was a safe and secure storage facility that would keep careful track of their account holdings and provide accurate and timely reporting. In reality, WHC and Unger did little, if any, due diligence on FSDC and directed customers to use FSDC as a depository solely in furtherance of their middleman role and the profits they earned from serving in that role.

47.     Worse than doing little if any due diligence on FSDC, WHC and Unger knew as early as 2019—before Glahn opened his new IRA at New Direction—that FSDC was being investigated by the Commodity Futures Trading Commission ("CFTC").  WHC and Unger knew this because Unger was subpoenaed as part of the investigation.  Yet, WHC and Unger did not stop directing customers to select FSDC as the depository for their assets, nor did WHC and Unger do anything to ensure that the assets of exhibits customers held as indicated in FSDC's vault.

### *The Theft Made Possible by WHC*

48.     The Silver Lease Program—promoted as a risk-free way for customers to generate income from their investments in ASEs—proved to be anything but risk free.

49.     Glahn and other WHC customers were led to believe their ASEs were physically and securely stored at FSDC except for those occasions when the ASEs would be leased out to

others. On those occasions, Glahn and other WHC customers were led to believe the ASEs that were leased out would be returned or replaced in short order.

50.    In reality, on information and belief, ASEs purportedly physically and securely stored at FSDC were transferred to Argent and Higgins and subsequently sold (not leased), with Higgins pocketing the money. This was facilitated in whole or in part by the fact that Higgins owned both FSDC and Argent and had complete control over the ASEs put on deposit with FSDC. WHC knew or should have known of this common ownership and yet failed to disclose this fact to Glahn and other WHC customers.

51.    Further, on information and belief, in instances where a WHC customer transferred money to WHC for the purpose of purchasing ASEs and WHC subsequently (and secretly) forwarded this money to Argent so it could make the purchase, Higgins pocketed the money and did not purchase anything.  This was facilitated in whole or in part by the fact that WHC relied on Argent to purchase the ASEs rather than purchasing the ASEs itself.  WHC failed to disclose to Glahn and other WHC customers that it was forwarding their money to a third party to purchase the ASEs that WHC customers had authorized WHC to purchase.

52.    On information and belief, WHC and Unger did nothing to monitor whether Argent had in fact purchased the ASEs that it was supposed to purchase.

53.    On information and belief, WHC and Unger did nothing to ensure that any ASEs purportedly leased to Argent were returned or replaced in short order or at all.

54.    Because FSDC and Argent were owned and controlled by the same individual, Higgins, WHC and Unger could not reasonably rely on FSDC to monitor Argent's activities, including whether ASEs leased to Argent were subsequently returned to customer accounts at FSDC or whether ASEs purportedly purchased by Argent were subsequently placed on deposit with FSDC.

55.     The common ownership of FSDC and Argent, together with the fact that WHC was systematically and routinely leasing to Argent and only to Argent all the ASEs that it leased from WHC customers, dramatically increased the risk of the Silver Lease Program.  Unbeknownst to WHC customers, they were wholly reliant on the competency and integrity of one person, Higgins, to ensure their asserts were properly protected and accounted for.  Yet, WHC customers had no contractual or other relationship Higgins and did not and could not know his and Argent's true role in the Silver Lease Program.

### *The Harm to WHC Customers*

56.      Because of WHC's omissions and concealments, Glahn and other WHC customers participated in the Silver Lease Program, believing it to be a risk-free way to generate income from their investments in ASEs.

57.     In actuality, the Silver Lease Program was extraordinarily risky.  No reasonable investor, with knowledge of the facts that were omitted or concealed, would have participated in the Silver Lease Program.  The return on investment was nominal compared with the risk of loss.

58.     Glahn lost all the ASEs he purchased or believed he purchased from or through WHC.

59.     On information and belief, hundreds of other WHC customers who also participated in the Silver Lease Program also lost all the ASEs they purchased or believed they purchased from or through WHC.

60.     On information and belief, through its Silver Leasing Program, WHC helped funnel more than 600,000 ASEs with a market value in excess of $10,000,000.00 to Argent where they were pilfered by Higgins.

11

**Class Action Allegations**

61.     Plaintiff brings this action pursuant to Rules 23(b)(2) & (3) of the Federal Rules of Civil Procedure.

62.     Plaintiff brings this action on behalf of all persons and entities who entered into a Silver Deposit Account Lease Agreement or substantively similar agreement with WHC during the time period April 20, 2018, through the present, selected FSDC as the depository for assets subject to the Silver Lease Program and lost all or part of those assets (the "Class").  Excluded from the Class are Defendants herein, any other officers or directors of WHC, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable. Public reports suggest that there were over 200 participants in the Silver Lease Program.  On information and belief, each of these participants entered into a Silver Deposit Account Lease Agreement or substantively similar agreement with WHC.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws that are complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and complex litigation and class actions.

66.     Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

12

    a.      Whether the Silver Deposit Account Lease Agreement is a security under the Exchange Act;

    b.      Whether, in soliciting investors for the Silver Lease Program, Defendants omitted or concealed material facts that a reasonable investor would have considered important in deciding to invest;

    c.      Whether Defendants acted knowingly or recklessly in omitting or concealing material facts regarding the Silver Lease Program at the time it was soliciting investors for that program;

    d.      Whether Defendants' acts as alleged herein violated the federal securities laws; and

    e.      Whether Plaintiff and the Class have sustained damages from Defendants' conduct and the proper measure of those damages.

68.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small in relation to the cost and complexity of an action for securities fraud, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

69.     Because this case primarily involves the failure to disclose material facts, Plaintiff will prove reliance in the manner set forth in the *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), i.e., by proving that Defendants omitted or concealed material facts that a reasonable investor would have considered important in deciding to invest.

## Count I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against WHC and Unger, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the class period, WHC and Unger, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     WHC and Unger violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Glahn and other WHC customers connection with customers' participation in the Silver Lease Program.

74.     WHC and Unger acted with scienter in that they knew but chose not to disclose the Silver Lease Program was extraordinarily risky in that all ASEs were leased to a single entity, Argent, that was owned and controlled by an individual, Higgins, who also owned and controlled the depository, FSDC, where all WHC's customers' ASEs purportedly were stored. WHC and Unger knew but chose not to disclose that it was acting merely as a middleman, funneling its customers' ASEs to Argent and Higgins in return for payment.  WHC knew but chose not to disclose it exercised little if any oversight or control over its customers' ASEs but instead relied exclusively

or almost exclusively on the competency and integrity of Argent and Higgins to safeguard its customers' assets.  Meanwhile, despite possessing this and other undisclosed knowledge about the Silver Lease Program and Argent and Higgins as described herein, WHC and Unger continued to promote the program to its customers as a risk-free way to generate income from their investment in precious metals.

75.     Unger, as the sole member and Chief Executive Officer of WHC, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Glahn and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements he made to members of the investing public, including Glahn and the Class.

76.     The omissions and concealments described herein were material facts that a reasonable investor would have considered important in deciding to invest.

77.     Had Plaintiff and the other members of the Class been aware of the material facts the Defendants omitted or concealed, they would not have participated in the Silver Lease Program.

78.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

79.     By reason of the foregoing, the WHC and Unger have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Glahn and the other members of the Class for substantial damages which they suffered in connection with their participation in the Silver Lease Program during the Class Period.

## Count II

### Violation of Section 20(a) of the Exchange Act Against Unger

80.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

15

81.     During the Class Period, Unger participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the WHC's business affairs. Because of his senior position, he knew the adverse non-public information regarding WHC's business practices.

82.     As an officer of WHC, Unger had a duty to disseminate accurate and truthful information with respect to WHC's investment offerings, in particular the Silver Lease Program and to correct promptly any statements issued by WHC which were materially false or misleading.

83.     Because of his position of control and authority as a senior officer, Unger was able to, and did, control the contents of the various representations WHC disseminated to Glahn and the Class and the general public during the Class Period. Throughout the Class Period, Unger exercised his power and authority to cause the WHC to engage in the wrongful acts complained of herein. Unger, therefore, was a "controlling person" of WHC within the meaning of Section 20(a) of the Exchange Act.

84.     By reason of the foregoing conduct, Unger is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by WHC.

## Count III

### Fraudulent Concealment Against All Defendants

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     Plaintiff pleads this claim in the alternative, in the event the Silver Deposit Account Lease Agreement is determined not to be a security within the meaning of the Exchange Act.

87.     During the class period, WHC and Unger, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to

16

disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     WHC and Unger acted with scienter in that they knew but chose not to disclose the Silver Lease Program was extraordinarily risky in that all ASEs were leased to a single entity, Argent, that was owned and controlled by an individual, Higgins, who also owned and controlled the depository, FSDC, where all WHC's customers' ASEs purportedly were stored. WHC and Unger knew but chose not to disclose that it was acting merely as a middleman, funneling its customers' ASEs to Argent and Higgins in return for payment.  WHC knew but chose not to disclose it exercised little if any oversight or control over its customers' ASEs but instead relied exclusively or almost exclusively on the competency and integrity of Argent and Higgins to safeguard its customers' assets.  Meanwhile, despite possessing this and other undisclosed knowledge about the Silver Lease Program and Argent and Higgins, WHC and Unger continued to promote the program to its customers as a risk-free way to generate income from their investment in precious metals.

89.     Unger, as the sole member and Chief Executive Officer of WHC, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Glahn and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements he made to members of the investing public, including Glahn and the Class.

90.     The omissions and concealments described herein were material facts that a reasonable investor would have considered important in deciding to invest.

91.     Had Plaintiff and the other members of the Class been aware of the material facts the Defendants omitted or concealed, they would not have participated in the Silver Lease Program.

92.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

93.     Defendants acted recklessly or with willful indifference to the rights of Glahn and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative and appointing undersigned counsel as counsel for the Class;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and other members of the Class punitive damages;

D.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

E.      Awarding such other and further relief as this Court may deem just and proper.


Respectfully submitted,

**BARTLE & MARCUS, LLC**

By: /s/ David L. Marcus
David L. Marcus, KS #18034
4700 Belleview Avenue
Suite 200
Kansas City, Missouri 64112
dmarcus@bmlawkc.com
Tel: (816) 256-4699
Fax: (816) 222-0534

*Attorney for Plaintiff*