## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN CLIFFORD GLAHN, on behalf of
himself and others similarly situated,

        *Plaintiff*,

v.

        Case No. 23-1064-EFM

WEST HILLS CAPITAL, LLC and
JOSEPH UNGER,

        *Defendants*.

## MEMORANDUM AND ORDER

Before the Court are two motions: Plaintiff's Motion to Strike (Doc. 12) and Defendants' Motion to Dismiss (Doc. 8). Pro se Defendant Joseph Unger filed a Motion to Dismiss on behalf of himself and his company, Defendant West Hills Capital ("WHC"). Specifically, Unger argues that Plaintiff fails to meet the heightened pleading standard required for a securities fraud action under Rule 9(b) and the Private Securities Litigation Reform Act of 1995[1] (the "PSLRA").

In moving to strike Unger's Motion, Plaintiff admits that Unger may represent himself pro se but argues that companies must appear by counsel under Kansas law. For the reasons stated below, the Court grants Plaintiff's motion in part—striking only the parts of the Motion to Dismiss that pertain to WHC—and denies what remains of Unger's Motion to Dismiss.

---

[1] Codified as 15 U.S.C. §§ 78a–78rr.

## I.    Factual and Procedural Background[2]

Joseph Unger is the CEO of WHC, a company that specializes in the sale and promotion of precious metals, primarily to older individuals. WHC directs its customers to create an individual retirement account ("IRA") specifically designated for these precious metals. WHC markets precious-metal-IRAs as a low-risk method for growing wealth.

In May 2019, Plaintiff John Glahn decided to purchase precious metals from WHC through an IRA. At WHC and Unger's urging, Plaintiff decided to purchase American Silver Eagles ("ASEs"), the official silver bullion coin issued by the United States Mint. To facilitate this purchase, WHC and Unger directed Plaintiff to open an IRA at New Direction Trust Company.

Following Defendants' advice, Plaintiff executed an Interested Party Designation Form, identifying the interested party as "West Hills Capital/Joe Unger/WHC IRA Team." This form gave WHC, Unger, and the WHC IRA Team unlimited access to Plaintiff's IRA at New Direction. Plaintiff also executed a Precious Metals Buy Direction Letter, identifying WHC as the precious metals dealer. This authorized New Direction to allocate $176,700 from Plaintiff's IRA for the purchase of ASEs from WHC. Finally, Plaintiff executed a Depository Election Form, designating First State Depository Company ("FSDC") as the place where Plaintiff's ASEs would be physically stored.

Following the execution of these documents, $176,700 from Plaintiff's IRA was purportedly used to purchase 10,000 ASEs from WHC. During this transaction, WHC asked Plaintiff if he would be interested in participating in the Silver Lease Program. This program promised WHC customers the opportunity to earn a fixed fee in exchange for leasing their ASEs to WHC. WHC and Unger represented that ASEs leased from customers under the Silver Lease

---

[2] The facts in this section are taken from Plaintiff's Complaint unless otherwise cited.

Program would be fully insured and promptly returned to the customer's account. Plaintiff agreed to participate in the Silver Lease Program and entered into a Lease Agreement with WHC.

In reality, WHC had little or no control or oversight over the ASEs that customers leased to WHC as part of the Silver Lease Program. Unbeknownst to Plaintiff, WHC was leasing its customers' ASEs to a company known as Argent Asset Group. Argent and FSDC are owned and controlled by the same person: Robert Higgins. Just a few years prior, a different Higgins entity and FSDC were found liable for tortious conversion of collateral related to a $10 million loan. Neither Unger nor WHC disclosed these facts to their customers.

As it turns out, Plaintiff's ASEs were not physically and securely stored at FSDC. Rather, the ASEs were transferred to Argent and Higgins, who sold Plaintiff's ASEs and pocketed the money. For other customers, WHC never purchased any ASEs. Instead, it forwarded the customers' money directly to Argent so that Argent could make the purchase. But instead of purchasing ASEs, Higgins did not purchase anything and kept the money for himself. WHC failed to tell Plaintiff and other customers that it was forwarding their money to a third party to purchase the ASEs that only WHC had been authorized to purchase.

Through its Silver Leasing Program, WHC helped funnel more than 600,000 ASEs with a market value exceeding $10 million to Argent where they were pilfered by Higgins. Plaintiff lost all the ASEs he purchased or believed he purchased through WHC. Hundreds of other WHC customers participating in the Silver Lease Program also lost all the ASEs they purchased or believed they purchased through WHC. These losses led to the present lawsuit.

On April 20, 2023, Plaintiff filed this securities class action against WHC and Joseph Unger for violations of federal securities law. On August 18, 2023, Defendants filed a Motion to Dismiss for failure to state a claim under Rule 12(b)(6). On August 29, 2023, Plaintiff filed a

Motion to Strike Defendants' Motion to Dismiss on the basis that Unger cannot represent his company because he is not a licensed attorney. Plaintiff timely responded to Defendants' Motion to Dismiss, but Defendants failed to respond to Plaintiff's Motion to Strike or reply to Plaintiff's Response to the Motion to Dismiss.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move for dismissal of any claim for which the plaintiff has failed to state a claim upon which relief can be granted.[3] Upon such motion, the court must decide "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"[4] A claim is facially plausible if the plaintiff pleads facts sufficient for the court to reasonably infer that the defendant is liable for the alleged misconduct.[5] The plausibility standard reflects the requirement in Rule 8 that pleadings provide defendants with fair notice of the nature of claims as well the grounds on which each claim rests.[6] Under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint, but need not afford such a presumption to legal conclusions.[7] Viewing the complaint in this manner, the court must decide whether the plaintiff's allegations give rise to more than speculative possibilities.[8] If the allegations in the complaint are "so general that they encompass a wide swath of conduct, much

---

[3] Fed. R. Civ. P. 12(b)(6).

[4] *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

[7] *Iqbal*, 556 U.S. at 678–79.

[8] *See id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"[9]

### III.    Analysis

#### A.    Plaintiff's Motion to Strike Defendant's Motion to Dismiss

Plaintiff asks this Court to strike Unger and WHC's Motion to Dismiss. Plaintiff argues that WHC cannot represent itself nor can it be represented by its owner, Joseph Unger, unless Unger is a licensed attorney—a fact lacking support in either the Complaint or Defendants' motion.

Kansas law is clear: corporations and limited liability companies cannot appear in court pro se and must be represented by licensed counsel.[10] Without any indication that WHC is represented by licensed counsel, WHC cannot enter filings on this Court's docket. As such, WHC cannot move to dismiss Plaintiff's claims against itself. Accordingly, the Court strikes the parts of Defendants' Motion to Dismiss that pertain to WHC.

However, the Court declines to strike the parts of Defendants' Motion to Dismiss that pertain to Unger. Because Unger retains the right to represent himself, he may properly move to dismiss the claims against him. And he may continue to represent himself throughout this litigation if he so chooses. Thus, the Court grants in part and denies in part Plaintiff's Motion to Strike and will next analyze the parts of Defendants' Motion to Dismiss that pertain to Unger.

#### B.    Unger's Motion to Dismiss

Proceeding pro se, Unger asks the Court to dismiss this case, arguing that Plaintiff fails to state a claim upon which relief can be granted under Rule 12(b)(6). Unger makes two arguments:

---

[9] *Robbins*, 519 F.3d at 1247 (quoting *Twombly*, 550 U.S. at 570).

[10] *BD Med. Supplies LLC v. Bluestem Mgmt. Advisors, LLC*, 2023 U.S. Dist. LEXIS 107585, at *2–3 (D. Kan. June 21, 2023); *see also Atchison Homeless Shelters v. Cnty. of Atchison*, 24 Kan. App. 2d 454, 455, 946 P.2d 113, 114 (1997) ("[C]orporations can only be represented in Kansas courts by an attorney duly licensed to practice law in Kansas.").

(1) the Lease Agreement is not a security, so federal securities law does not apply, and (2) Plaintiff fails to meet the heightened scienter requirement as outlined in Rule 9(b) and the PSLRA. The Court will address each argument in turn.

    *1.     The Lease Agreement is an investment contract and thus a security.*

Unger argues that Plaintiff's purchase of ASEs and entry into the Lease Agreement does not constitute a security under federal securities law. Although the securities laws broadly define a security, they do not specifically define an "investment contract."[11] In *SEC v. W.J. Howey Co.*, the Supreme Court developed a test to distinguish an investment contract from other commercial dealings.[12] The Court defined an investment contract as "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party."[13] Unger contests the second element, claiming that no common enterprise existed.

To determine whether a common enterprise exists, courts choose between two approaches: horizontal commonality or vertical commonality.[14] This Court applies vertical commonality to meet the second element.[15] Under this approach, a common enterprise exists when the "fortunes of all investors" are "inextricably tied to the efforts of the promoters."[16]

---

[11] *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[12] 328 U.S. 293, 298–99 (1946).

[13] *Id.*

[14] *See 537721 Ontario, Inc. v. Mays*, 14 Kan. App. 2d 1, 3–4, 780 P.2d 1126, 1128 (1989) (explaining the difference between horizontal commonality and vertical commonality).

[15] *Bank of Com. v. Dominique*, 2010 U.S. Dist. LEXIS 151539, at *3 (D. Kan. Jan. 25, 2010).

[16] *Id.* at *3 (citing *Mays*, 14 Kan. App. 2d at 4, 780 P.2d at 1129).

The arrangement outlined in the Lease Agreement parallels the arrangement upheld by the Supreme Court in *SEC v. Edwards*.[17] There, the parties agreed that the consumer would purchase payphones and then lease them back to the seller for a fixed monthly fee.[18] Then, the seller/lessee would utilize the payphones to generate coin revenue, and this coin revenue would cover the fixed fee due to the consumer/lessor.[19]

The seller argued that no investment contract existed because the agreement did not offer the consumer any capital appreciation or the opportunity to participate in the earnings of the enterprise.[20] However, the Supreme Court disagreed, finding that the SEC has consistently maintained "that a promise of a fixed return does not preclude a scheme from being an investment contract."[21] If further noted that "[t]here is no reason to distinguish between promises of fixed returns and promises of variable returns. . . . In both cases, the investing public is attracted by representations of investment income."[22] Lastly, the Supreme Court reasoned that "[t]he fact that investors have bargained for a return on their investment does not mean that the return is not also expected to come solely from the efforts of others."[23]

Unger argues that no common enterprise existed because the Lease Agreement only called for the physical exchange of a commodity. That is, Plaintiff would merely provide WHC with silver, and in exchange, WHC would compensate Plaintiff with a recurring fixed fee. Ironically, this articulation mirrors the exact agreement recognized as an investment contract in *Edwards*.

---

[17] 540 U.S. 389 (2004).

[18] *Id.* at 391.

[19] *Id.* at 392.

[20] *Id.* at 392–93.

[21] *Id.* at 396.

[22] *Id.* at 394.

[23] *Id.* at 397.

Under Kansas law, all Plaintiff must claim is that his fortunes were inextricably tied to Unger's efforts. Here, like in *Edwards*, Plaintiff claims that his fortunes (i.e., the fixed monthly payments he agreed to receive based on the number of ASEs he opted to lease to WHC) were dependent upon Unger's efforts (i.e., Unger's ability to trade, alter, or use the leased ASEs to complete sales to customers desiring to purchase silver). Thus, the fixed fees Plaintiff agreed to receive were a direct result of and solely dependent on his investment contract with Unger.

Therefore, taking Plaintiff's allegations concerning the Lease Agreement as true, the Court finds that an investment contract existed. As Unger does not dispute any other *Howey* elements, the Court concludes that Plaintiff has plausibly pled the common enterprise element of the *Howey* test. Thus, the Court finds that the Lease Agreement is a security and will subsequently apply federal securities law in this case.

### 2. *Plaintiff has sufficiently pled scienter under Rule 9(b) and the PSLRA.*

Next, Unger states that Plaintiff "utterly failed to plead that Mr. Unger acted with the requisite scienter, or intent to defraud." But instead of supporting this allegation with facts and legal arguments, Unger instead spends the remainder of his motion shifting the blame to Robert Higgins. Unger argues that Higgins is solely responsible for the theft, falsification, and other crimes to which Plaintiff fell victim. Moreover, Unger claims that he lacked motive to participate in Higgins's fraud and should not be held responsible for Higgins's actions.

Although Unger may assert lack of knowledge or motive as an affirmative defense, the Court will not weigh the credibility of Plaintiff's allegations against Unger's defenses. Rather, on a motion to dismiss, the Court must accept as true all factual allegations in the complaint. As such, the Court will only analyze whether Plaintiff has sufficiently pled scienter under Rule 9(b) and the PSLRA.

Unlike general pleading requirements, plaintiffs alleging fraud must meet a heightened pleading standard. Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Additionally, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead facts showing:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[24]

Unger only alleges that Plaintiff fails to plead facts showing the third element. However, Plaintiff alleges plenty of facts giving rise to a strong inference that Unger acted with scienter. For example, Plaintiff alleges that Unger plays a prominent role in WHC's marketing, appearing on its website in a video telling potential customers, "[w]e're old fashioned" and "[w]hen you do a deal with West Hills Capital, we do it on a handshake." The video ends with the words "Preservation. Growth. And Income." The website also markets precious metals as "a safe harbor for your investments." These words and actions lead customers to believe that investing with Unger and WHC is a low-risk method for growing their wealth.

Plaintiff alleges that Unger was the one to urge him to purchase ASEs, to open an IRA at New Direction Company, to designate Unger as the interested party, and to give Unger unlimited access to his IRA. According to the Precious Metals Buy Direction Letter, Plaintiff authorized WHC, and WHC alone, to purchase ASEs. Additionally, according to the Lease Agreement, Plaintiff agreed to lease his ASEs to WHC, and WHC alone. Yet, Unger failed to disclose to

---

[24] *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200 (10th Cir. 2015) (quoting *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012)) (original emphasis omitted).

Plaintiff that he either (1) leased Plaintiff's ASEs to Argent and Argent subsequently sold them; or (2) never purchased Plaintiff's ASEs in the first place and gave the money directly to Argent instead.

As the sole member and CEO of WHC, Unger must have had knowledge of WHC's internal operations and dealings. But despite this knowledge, Unger failed to disclose to Plaintiff that the Silver Lease Program was extraordinarily risky because all his ASEs were leased to a single entity, Argent, that was owned and controlled by a single individual, Higgins, who also owned and controlled the depository, FSDC, where all WHC's customers' ASEs were purportedly stored. Moreover, Unger failed to disclose that he was funneling its customers' ASEs to Argent and Higgins in return for payment.

Despite marketing the program as "safe," Unger failed to disclose that WHC exercised little to no control over its customers' ASEs, instead relying exclusively on the competency and integrity of Argent and Higgins to safeguard its customers' assets. Thus, Unger must have known that, given WHC's arrangement with Argent, it was impossible to satisfy the Lease Agreement's terms that obligated WHC to promptly return Plaintiff's borrowed silver or its equivalent value to his account.

These facts, among others mentioned in the Complaint, allow the Court to reasonably infer that Unger acted with the requisite scienter when making misleading statements to Plaintiff. As such, the Court finds that Plaintiff has met the heightened pleadings standard under both Rule 9(b) and the PSLRA. Accordingly, Unger's Motion to Dismiss is denied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Strike Defendants' Motion to Dismiss (Doc. 12) is **GRANTED** in part and **DENIED** in part. The Court strikes Defendants'

Motion to Dismiss as it pertains to Defendant West Hill Capital but not as it pertains to Defendant Unger.

**IT IS FURTHER ORDERED** that Defendant Unger's Motion to Dismiss (Doc. 8) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 8th day of April, 2024.


*Eric F. Melgren*

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE